# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**BRITTANY L. ARCHIBALD**
        **Plaintiff,**

    **v.**                              **Case No. 25-C-1170**

**FRANK BISIGNANO,**
**Commissioner of the Social Security Administration**
        **Defendant.**

---

## DECISION AND ORDER

Plaintiff Brittany Archibald seeks judicial review of the denial of her application for social security disability benefits. She argues that the Administrative Law Judge (ALJ) who decided her case improperly discounted the opinions of her treating physician and inadequately evaluated her subjective statements about the severity of her symptoms. Finding no reversible error in the ALJ's handling of these issues, I affirm the decision and dismiss this action.

## I. FACTS AND BACKGROUND

### A.    Plaintiff's Application and Agency Decisions

Plaintiff applied for benefits in June 2022, alleging a disability onset date of June 15, 2020, when she was 34 years old (Tr. at 191, 218), based on the impairments of Chiari malformation type 1, POTS (postural orthostatic tachycardia syndrome), tethered cord, and herniated/ruptured discs (Tr. at 221). She alleged that her conditions limited her ability to work because she frequently got dizzy; she also reported fainting spells and tachycardia when on her feet. (Tr. at 230.) In a function report, plaintiff wrote that she cared for her two children, with help from her fiancé. (Tr. at 231.) She set a reminder on her watch to take medications. She

tried to do laundry, cleaning, and household chores depending on her symptoms. (Tr. at 232.) She was able to drive a car, shop, and handle money. (Tr. at 233.) She indicated that she did go out but was afraid to go alone due to fear of fainting. (Tr. at 234.) Plaintiff alleged that her impairments affected her ability to lift, walk, climb stairs, sit, see, bend, stand, complete tasks, reach, and concentrate. She reported that she could lift 5-10 pounds and walk 10-15 minutes. She followed instructions and got along with authority figures well. (Tr. at 235.) Stress was a trigger, but she handled changes in routine good. She reported using a shower chair, but noted no other assistive devices, e.g., a cane or walker, in this report. (Tr. at 236.)

The agency denied the application at the initial level on April 26, 2023, based on the review of Robert Barthell, Psy.D., and Mina Khorshidi, M.D. (Tr. at 78, 89.) Dr. Barthell found mild limitation in the ability to understand, remember or apply information, interact with others, and adapt or managing oneself, and moderate limitation in the ability to concentrate, persist or maintain pace. (Tr. at 71.) He opined that plaintiff could do simple work for two hour periods in an eight-hour day with adequate attention, concentration, and pace. She could have occasional problems with prolonged concentration and sustained pace. She may occasionally have difficulty maintaining concentration on complex instructions of more than three steps and maintaining punctuality. However, for the most part, she had shown the ability to sustain a 40-hour week and complete one-two step tasks or commands. (Tr. at 75.) Dr. Khorshidi found plaintiff capable of light work, with occasional stooping, and avoiding concentrated exposure to fumes due to a recent COVID-19 infection and hazards due to her history of vertigo and dizziness. (Tr. at 73-74.)

Plaintiff requested reconsideration (Tr. at 100), submitting another function report, in which she alleged symptom flares due to light sensitivity and looking up or down too long. She

2

also reported getting dizzy when standing. (Tr. at 251.) She cooked with the help of others and did housework as her symptoms allowed. She could not bend forward and her legs went numb. She could not lift over 10 pounds. She could do laundry, clean, and shop with help. (Tr. at 253.) She tried to get out every day but never by herself. (Tr. at 254.) She alleged that her impairments affected her ability to lift, walk, climb stairs, squat, sit, see, bend, kneel, remember, stand, talk, complete tasks, reach, and concentrate. (Tr. at 256.) She could lift no more than 10 pounds and walk about one block. (Tr. at 256.) She did not handle stress or changes in routine well. She reported using a cane and shower chair. (Tr. at 257.)

On February 7, 2024, the agency denied reconsideration based on the review of Frank Orosz, Ph.D., and Pat Chan, M.D. (Tr. at 88, 101.) Dr. Orosz found mild limitations in the four areas of mental functioning (Tr. at 82), opining that plaintiff's anxiety caused only minimal symptoms and was not severe (Tr. at 83). Dr. Chan found plaintiff capable of light work; never climbing ladders, ropes, and scaffolds; occasionally stooping; and avoiding concentrated exposure to hazards due to her history of vertigo and dizziness. (Tr at 84-85.)

On February 27, 2024, plaintiff requested a hearing before an ALJ. (Tr. at 105.) On October 8, 2024, she saw her primary physician, Ali Siddiqui, M.D., to fill out a form to help with her disability claim. Dr. Siddiqui noted that plaintiff had been suffering from POTS for multiple years. She reported that her current symptoms included sudden onset severe dizziness, where she was unable to function, and chronic fatigue. The dizziness could be precipitated or exacerbated by any head movements. The syncopal episodes typically occurred without notice. When having symptoms of near syncope, plaintiff reported that she needed to lie down and place cool rags on her face to prevent from passing out. She also experienced palpitations, tachycardia, and anxiety. She further experienced light sensitivity and could not tolerate

3

extremes of temperature. She reported chronic brain fog, and fear and anxiety from being alone because of the symptoms. She received medications through cardiology for management of her condition. She also had chronic neck and back pain, seeing pain management for pain medication. (Tr. at 2455.)

Dr. Siddiqui opined that because of her medical conditions plaintiff had severe limitations in her overall activities of daily living, and attempting to work had been a challenge for her. She was usually unable to walk more than three to four blocks without extreme fatigue; prolonged sitting or standing could also cause exacerbation of her symptoms. She would need to be able to lie down at very short notice if she had an exacerbation of symptoms. This would then require appropriate hydration, lifting up her lower extremities, as well as cool rags to help prevent her from passing out. She had occasionally used a walker for prolonged ambulation. She also avoided carrying anything over 10 pounds. Any sudden movements of the head, sustained flexion or extension, could also cause worsening of her dizziness. Finally, she was limited in her ability to climb ladders and avoided using the stairs. (Tr. at 2457.)

**B.    Hearing**

On November 5, 2024, plaintiff appeared with counsel for her hearing. The ALJ also called a vocational expert (VE) to offer testimony on jobs plaintiff might be able to do. (Tr. at 38.)

Plaintiff testified that she had done some part-time work delivering food, accompanied by her fiancé, who did most of the driving and heavy lifting. (Tr. at 43-44.) She indicated that she stood 5'7" tall and weighed 110 pounds, and lived with her boyfriend and two children, ages 16 and 20. (Tr. at 45.)

Plaintiff testified that her POTS caused light-headedness, dizziness, and fainting-type

symptoms, which occurred every day multiple times a day. The symptoms were triggered by light sensitivity, which she addressed by wearing sunglasses, becoming overheated, reading, looking down for too long, bending over, or sitting or standing for too long. (Tr. at 46.) Doing tasks like laundry, dishes, or anything that required her to bend her head up or down also triggered symptoms. (Tr. at 47.)

Plaintiff testified that she when she started feeling the symptoms coming on she would sit down and watch her heart-rate. If her heart-rate did not go down, she would take a beta blocker or eat salt. She would go into a quiet area with no lights to calm down. She would need to do this for 30 minutes to a couple hours before resuming activities. (Tr. at 47.) There was no pattern to when she experienced these symptoms, just the triggers, and she got them multiple times a day. She would start by sitting down and then gradually lie down; 90% of the time she ended up laying down. (Tr. at 48.)

Plaintiff testified that she could stand for 30-40 minutes before needing to sit. She could sit for an hour but was constantly moving around. (Tr. at 48.) She could not lift more than 10 pounds. (Tr. at 47, 51.) Plaintiff indicated that she also experienced fatigue, always feeling exhausted. She never felt fully rested, even after full night's sleep. (Tr. at 49.)

Plaintiff testified that for her neck and back she was scheduled for Botox injections. Previous injections had not helped. She also took pain medication. (Tr. at 50.) She had tried physical therapy without improvement. (Tr. at 50-51.)

Plaintiff testified that she also had a tethered spinal cord, which required her to frequently use the bathroom and caused numbness in her legs. She planned to have surgery, which the doctor indicated would not reverse the nerve damage but would help with the bathroom use. She testified that she had to urinate every 30 minutes to an hour. (Tr. at 52.)

5

Plaintiff testified that her conditions also affected her memory, and she used a dry erase board or alarms on her phone to remember to take medications. (Tr. at 53-54.) She also struggled with her balance, for which she used a walker. She tried to get one through her doctor, but "they denied me because they said I was too young, but I did purchase that myself because it does help tremendously." (Tr. at 55.)

The ALJ then turned to the VE, asking her to assume a person of plaintiff's age, education, and experience, limited to sedentary work; with occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; occasional stooping, kneeling, crouching, and crawling; and needing to avoid all exposure to hazards including moving machinery and unprotected heights, but did not need to avoid ordinary hazards such as open doors, boxes on the floor, or approaching people. (Tr. at 57.) The VE responded that such a person could perform jobs such as telephone quotation clerk, final assembler, and trimmer. (Tr. at 57.) The VE testified that more than two absences per month, 15% time off task, or a need to lie down would be work-preclusive. (Tr. at 58.)

## C.   ALJ's Decision

On November 25, 2024, the ALJ issued an unfavorable decision. (Tr. at 12.) Following the familiar five-step evaluation process, the ALJ determined at step one that plaintiff had not engaged in substantial gainful activity (SGA) since June 15, 2020, the alleged onset date. While she had done some part-time work, it did not rise to the level of SGA. (Tr. at 17.)

At step two, the ALJ found that plaintiff had the severe impairments of postural orthostatic tachycardia syndrome (POTS), Chiari malformation, degenerative disc disease of the cervical and lumbar spine, and tethered cord. (Tr. at 17.) The record referenced a variety of other impairments, e.g., hypertension, migraines, and anxiety, which the ALJ found non-

6

severe. (Tr. at 18.) The ALJ specifically found that plaintiff's anxiety produced no more than mild limitation in the broad areas of mental functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. at 19.)

At step three, the ALJ determined that plaintiff's impairments did not meet or equal a Listing. (Tr. at 20.) She considered plaintiff's back impairments under Listings 1.15 and 1.16, finding that plaintiff failed to demonstrate a documented medical need for a walker, bilateral canes, or bilateral crutches; an inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements, and a documented medical need for a one-handed, hand-held assistive device that requires the use of the other upper extremity; or an inability to use both upper extremities to independently initiate, sustain, and complete work-related activities involving fine and gross movements. (Tr. at 20.) At the hearing, plaintiff testified that she found an assistive device for ambulation to be helpful, but one had not been prescribed because she was too young. (Tr. at 20.) The medical record showed that during a video visit in July 2024 plaintiff asked Dr. Siddiqui for an assistive device, perhaps a walker, due to reported episodes of dizziness. (Tr. at 20-21.) Dr. Siddiqui did not observe any deficits during the appointment but noted that plaintiff might benefit from using an assistive device, specifically a walker for longer distances outside the house, and sent a "request" for one. However, the record did not show that plaintiff received an assistive device or that she used one at subsequent appointments. In contrast, she was generally noted to have a normal gait. The ALJ accordingly found that plaintiff had not demonstrated a documented medical need for an assistive device. Further, she retained the ability to use her upper extremities to perform fine and gross movements. (Tr. at 21.)

7

The ALJ considered plaintiff's tethered spine under Listing 11.08, finding that plaintiff had not experienced complete loss of function; disorganization of motor function in two extremities, resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities; or marked limitation in physical functioning and in one of the areas of mental functioning. Finally, the ALJ noted that here is no specific Listing for POTS. (Tr. at 21.)

Prior to step four, the ALJ determined that plaintiff had the residual functional capacity (RFC) to perform sedentary work, except that she could occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl; and needed to avoid all exposure to hazards including moving machinery and unprotected heights, but did not need to avoid ordinary hazards such as open doors, boxes on the floor, or approaching people. (Tr. at 21.) In making this finding, the ALJ considered plaintiff's alleged symptoms and the medical opinion evidence. (Tr. at 21.)

In considering plaintiff's symptoms, the ALJ followed the two-step process set out in the regulations, under which it must first be determined whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms. (Tr. at 21.) Second, once an underlying physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. At this step, if the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must consider other evidence in the record to determine if the

8

claimant's symptoms limit the ability to do work-related activities. (Tr. at 22.)

Plaintiff alleged work-related limitations due to Chiari malformation type I, POTS, tethered cord, and herniated/ruptured discs, reporting difficulty walking, standing, lifting, bending, reaching, climbing stairs, seeing, concentrating, and completing tasks. At the hearing, plaintiff testified that she experienced lightheadedness, dizziness, and fainting symptoms on a daily basis due to her POTS, with the symptoms triggered by light, being overheated, reading, looking down, and bending over. She wore sunglasses to avoid an episode, and she was cautious with tasks that required her to bend her head down or up. When her symptoms started, she sat or laid down in a quiet area. These episodes lasted 30 minutes to a few hours before she felt normal again. (Tr. at 22.)

Plaintiff further testified that she had tried injections and physical therapy for her back pain, but they had not improved her symptoms. She had taken pain medications for about 10 years. She planned to try Botox injections to address her pain, starting in her neck. Due to her tethered cord, she needed to use the bathroom frequently, about every 30-60 minutes. She also had numbness in her legs. Surgery was expected to improve her urinary frequency but would not reverse any nerve damage. (Tr. at 22.)

Plaintiff estimated she could sit for more than an hour, but she was constantly moving. She could stand for about 30-40 minutes and lift about 10 pounds. She felt her balance was off; she found an assistive device helpful when ambulating, but she had not been prescribed one. She testified that she always felt exhausted, even if she slept excessively, and could only do small tasks when she was tired. She used a dry erase board and alarms on her phone to help her remember things, which usually helped. (Tr. at 22.)

The ALJ found that plaintiff's medically determinable impairments could reasonably be

9

expected to cause the alleged symptoms, but that plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. at 22.) In support of this finding, the ALJ first reviewed the treatment records in detail, spanning 6-½ single spaced pages of the decision. (Tr. at 23-29.) She then concluded:

> After carefully considering the entire record, the undersigned finds the claimant retains the ability to perform a range of sedentary work with postural and environmental limitations. The claimant has been diagnosed with cervical and lumbar degenerative disc disease and tethered cord. She has a history of Chiari I malformation, and she has POTS. These impairments reasonably limit the claimant's ability to sit, stand, walk, climb ramps or stairs, stoop, kneel, crouch, and crawl. However, the claimant underwent a Chiari decompression surgery, and the results were successful. Post-operatively, she noted an improvement in her headaches, dizziness, imbalance, brain fog, urinary frequency and urgency, and hand clumsiness. The claimant has a tethered cord, but she has only intermittently noted urinary frequency. She has not scheduled a release procedure that was first offered in December 2002, suggesting her symptoms are tolerable. Imaging studies of the claimant's spine have shown mild degenerative changes in her cervical and lumbar spine without significant nerve root or spinal cord impingement. She has generally managed her back pain on medication. Though the claimant has reported using an assistive device, she has not been observed using one at appointments and is generally noted to have a normal or non-antalgic gait. As for her POTS, the undersigned considered the claimant's testimony that she experienced symptoms of dizziness or lightheadedness daily and that triggers were not predictable when finding she could never climb ladders, ropes, or scaffolds and must avoid all exposure to hazards (including moving machinery and unprotected heights). However, the record does not document ongoing issues with syncope, such as seeking medical treatment for injuries after fainting. It does not show that the claimant needs 30 minutes to a few hours to recover. Instead, the record indicates that the claimant's symptoms often resolve within less than a minute. Additionally, she has reported good management of her symptoms with use of medication and after vestibular rehabilitation. In the meantime, the claimant is able to prepare meals, help care for her children, drive a car if needed, shop in stores, watch TV, and manage funds. The overall record demonstrates the claimant can perform a limited range of sedentary work activity.

(Tr. at 29-30, internal record citations omitted.)

The ALJ next turned to the opinion evidence, starting with the report from plaintiff's

10

treating physician, Dr. Siddiqui:

> In October 2024, Dr. Siddiqui opined that the claimant usually was unable to walk more than 3-4 blocks without extreme fatigue. Prolonged sitting or standing for over 20-30 minutes could also exacerbate her symptoms. She would need to be able to lay down at a very short notice if she had an exacerbation of her symptoms. She would then need appropriate hydration, lifting up her lower extremities, and use of cold rags to prevent her from passing out. She occasionally used a walker for prolonged ambulation. She avoided carrying items over 10 pounds, as it might exacerbate her symptoms or due to fear of falling. Sudden movements of the head, sustained flexion/extension could also cause worsening of her dizziness. She had a limited ability to climb ladders and avoided using stairs. Dr. Siddiqui's opinion is less persuasive. Dr. Siddiqui is the claimant's primary care provider and is familiar with her condition. The record reasonably supports a 10-pound lifting restriction, a limited ability to climb stairs, and no ability to safely climb ladders. However, the remainder of Dr. Siddiqui's opinion statement relied heavily on the claimant's subjective complaints offered at the same visit. This opinion statement is not supported by the claimant's physical examination signs at appointments with Dr. Siddiqui. It is not consistent with other examinations in the record. The severity of limitations assessed is not consistent with the claimant's most recent cardiac follow up, where she reported she was feeling fine on her current regimen and was asked to return in one year. She was not advised to lay down, elevate her legs, or use cold rags. As noted above, the record does not demonstrate a need for a walker with ambulation. This opinion is less persuasive, because it is not consistent with the overall record.

(Tr. at 30, record citations omitted.)

The ALJ also considered the reports from the agency medical and psychological consultants. At the initial level, agency psychological consultant Dr. Barthell found that plaintiff had a moderate limitation in her ability to concentrate, persist or maintain pace, and a mild limitation in the remaining areas of mental functioning. He concluded that she was able to perform simple work for two-hour periods in an eight-hour workday and could complete one-two step tasks or commands, but might have difficulty maintaining concentration on complex instructions and with maintaining punctuality. The ALJ found Dr. Barthell's opinion less persuasive. While Dr. Barthell had disability program knowledge and was an expert in mental

11

health, he did not personally examine plaintiff or review the evidence received at the hearing level. (Tr. at 30.) The ALJ found that the evidence as a whole demonstrated plaintiff's anxiety had been managed with coping strategies or medication throughout the period at issue. (Tr. at 30-31.) She had not pursued therapy or inpatient treatment, nor had she required psychiatric hospitalization since her alleged onset date. Further, her mental status signs had been generally unremarkable, and she retained the ability to care for herself and her children without restriction from her anxiety. In sum, the overall record did not show that plaintiff's anxiety was severe, and Dr. Barthell's opinion was less persuasive because it was not consistent with the overall record. (Tr. at 31.)

On reconsideration, agency psychological consultant Dr. Orosz opined that plaintiff's anxiety caused only minimal symptoms and was non-severe. The ALJ found Dr. Orosz's conclusion persuasive, citing his disability program knowledge, specialization in mental health issues, and the objective evidence he described to support his finding. The ALJ further found his conclusion supported by plaintiff's mental status signs, treatment history, and range of daily activities. (Tr. at 31.)

At the initial level, agency medical consultant Dr. Khorshidi opined that plaintiff could perform light work with occasional stooping; needed to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation due to a recent COVID-19 diagnosis; and needed to avoid concentrated exposure to hazards. On reconsideration, agency medical consultant Dr. Chan added that plaintiff should never climb ladders, ropes, or scaffolds due to her POTS. Dr. Chan did not adopt a limitation regarding plaintiff's ability to work around respiratory irritants. The ALJ found these medical findings to be less persuasive. The medical consultants had disability program knowledge, but they did not examine plaintiff, review evidence received at

12

the hearing level, or listen to plaintiff's testimony. Nor were these findings fully supported by the objective evidence. They did not adequately consider the combination of plaintiff's impairments, which reasonably limited her to no more than sedentary exertional work with only occasional climbing of ramps or stairs, stooping, kneeling, crouching, and crawling. Due to her neck and back pain, POTS symptoms, and use of an opioid pain medication, she could not safely climb ladders, ropes, or scaffolds and needed to avoid all exposure to hazards including moving machinery and unprotected heights. Like Dr. Chan, the ALJ did not adopt Dr. Khorshidi's finding that plaintiff needed to avoid concentrated exposure to respiratory irritants after a recent COVID-19 infection, as later submitted evidence indicated plaintiff recovered without ongoing complications. The ALJ concluded that the RFC assessment was supported by an analysis of plaintiff's allegations, the medical records, and the opinion evidence. (Tr. at 31.)

At step four, the ALJ found that plaintiff had no past relevant work. (Tr. at 31.) Finally, at step five, the ALJ found that plaintiff could perform other jobs, as identified by the VE. (Tr. at 32.) The ALJ accordingly found plaintiff not disabled. (Tr. at 33.)

On June 5, 2025, the Appeals Council denied plaintiff's request for review (Tr. at 1), making the ALJ's decision the final word from the agency on plaintiff's application. Poole v. Kijakazi, 28 F.4th 792 , 794 (7th Cir. 2022). This action followed.

## II. DISCUSSION

### A.    Standard of Review

The court will uphold an ALJ's decision if it uses the correct legal standards, is supported by "substantial evidence," and sets forth an accurate and logical bridge from the evidence to

13

the conclusions. <u>Jeske v. Saul</u>, 955 F.3d 583, 587 (7th Cir. 2020). The threshold for substantial evidence "is not high." <u>Biestek v. Berryhill</u>, 587 U.S. 97, 103 (2019). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Id.</u> (internal quote marks omitted). The court reviews the entire record but may not replace the ALJ's judgment with its own by reconsidering facts, re-weighing the evidence, or deciding questions of credibility. <u>Jeske</u>, 955 F.3d at 587. Where substantial evidence supports the ALJ's disability determination, the court must affirm the decision even if reasonable minds could differ over whether the claimant is disabled. <u>L.D.R. v. Berryhill</u>, 920 F.3d 1146, 1152 (7th Cir. 2019).

The "logical bridge" requirement means the ALJ must provide an explanation for how the evidence leads to her conclusions that is sufficient to allow the reviewing court to assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review. <u>Warnell v. O'Malley</u>, 97 F.4th 1050, 1054 (7th Cir. 2024). But this articulation requirement is minimal. "An ALJ need not address every piece or category of evidence identified by a claimant, fully summarize the record, or cite support for every proposition or chain of reasoning." <u>Id.</u> at 1053.

## B.    Plaintiff's Arguments

### 1.    Medical Opinions

Plaintiff first challenges the ALJ's consideration of the opinions of her treating physician, Dr. Siddiqui. (Pl.'s Br. at 12.) The regulations require an ALJ to consider all of the medical opinions in the case record. 20 C.F.R. § 404.1520c(b). The ALJ need not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion, including those

14

from the claimant's treating providers. Id. § 404.1520c(a). Rather, the ALJ must articulate how "persuasive" she finds the opinions. Id. § 404.1520c(b). The factors of "supportability" and "consistency" are the most important in determining how persuasive an opinion is; therefore, the ALJ must explain how she considered these two factors. Id. § 404.1520c(b)(2). Supportability refers to the objective medical evidence and supporting explanations presented by the medical source, id. § 404.1520c(c)(1), and consistency refers to how consistent the medical opinion is with the evidence from other medical sources and non-medical sources in the record, id. § 404.1520c(c)(2); see also Bakke v. Kijakazi, 62 F.4th 1061, 1068 (7th Cir. 2023) ("As explained above, § 404.1520c requires an ALJ to consider whether a medical opinion is consistent with the record as a whole. The same regulation requires an ALJ, in reaching his conclusions, to consider the internal supportability of a physician's medical opinion.") (internal citation omitted). The ALJ may, but is not required to, explain how she considered the other regulatory factors: the source's relationship with the claimant, the source's specialization, and the source's familiarity with the other evidence in the record or an understanding of the disability program's policies and evidentiary requirements. 20 C.F.R. §§ 404.1520c(b)(2), (c)(3)-(5).

The ALJ complied with the regulatory requirements here, considering each of the medical opinions of record, as summarized above. (Tr. at 30-31.) The ALJ found "less persuasive" the October 2024 opinions from Dr. Siddiqui. The ALJ acknowledged that Dr. Siddiqui was plaintiff's primary care provider and thus familiar with her condition. The ALJ further found that the record supported a 10-pound lifting restriction, a limited ability to climb stairs, and no ability to safely climb ladders, as Dr. Siddiqui provided. However, the ALJ found that the remainder of Dr. Siddiqui's opinions relied heavily on plaintiff's subjective complaints

15

offered at the same visit where he provided these opinions. The ALJ further found that the opinions were not supported by plaintiff's physical examination signs at appointments with Dr. Siddiqui, nor were they consistent with other examinations in the record. The ALJ specifically cited plaintiff's most recent cardiac follow up, where she reported feeling fine on her current regimen and was not advised to lay down, elevate her legs, and use cold rags to avoid passing out. Finally, as explained earlier in the decision, the record did not support medical need for a walker with ambulation. (Tr. at 30.) These are valid reasons for discounting a treating source's report. See, e.g., Prill v. Kijakazi, 23 F.4th 738, 750-51 (7th Cir. 2022) (discounting opinion because it was inconsistent with the provider's own treatment notes); id. at 751 (noting that "when a physician's opinion is based primarily upon a patient's subjective complaints, the ALJ may discount that opinion"); Karr v. Saul, 989 F.3d 508, 511 (7th Cir. 2021) (finding that ALJ properly discounted treating physician's statement that was "inconsistent with other objective evidence in the record").

Plaintiff argues that Dr. Siddiqui's opinion was well-supported by her complicated medical history with symptoms of fatigue, dizziness, lightheadedness, near-syncope, and balance disruption. She notes that POTS and vertigo are commonly characterized by such symptoms, citing the Cleveland Clinic website. (Pl.'s Br. at 13.) She contends that Dr. Siddiqui's opinion is generally consistent with the expected presentation of POTS and with the evidence of heart rate and blood pressure variation, positive tilt table test confirming POTS, and findings consistent with vertigo in the physical therapy notes. (Pl.'s Br. at 14; Pl.'s Rep. Br. at 2.)

"[T]hat a condition often causes certain symptoms does not mean that a given claimant with that condition suffers from those symptoms, much less that her symptoms are of disabling severity." Stobbe v. Kijakazi, No. 20-C-777, 2021 U.S. Dist. LEXIS 148493, at *70 (E.D. Wis.

16

Aug. 9, 2021) (citing <u>Schmidt v. Barnhart</u>, 395 F.3d 737, 746 (7th Cir. 2005)); <u>see also</u> <u>Skinner v. Astrue</u>, 478 F.3d 836, 845 (7th Cir. 2007) ("[T]he existence of these diagnoses and symptoms does not mean the ALJ was required to find that Skinner suffered disabling impairments."). Moreover, plaintiff fails to acknowledge that the ALJ discussed the tilt table test results (Tr. at 25), her blood pressure variation (Tr. at 25), and the physical therapy she received for POTS (Tr. at 26, 28). The ALJ also specifically considered these symptoms in formulating the RFC:

> As for her POTS, the undersigned considered the claimant's testimony that she experienced symptoms of dizziness or lightheadedness daily and that triggers were not predictable when finding she could never climb ladders, ropes, or scaffolds and must avoid all exposure to hazards (including moving machinery and unprotected heights). However, the record does not document ongoing issues with syncope, such as seeking medical treatment for injuries after fainting. It does not show that the claimant needs 30 minutes to a few hours to recover. Instead, the record indicates that the claimant's symptoms often resolve within less than a minute. Additionally, she has reported good management of her symptoms with use of medication and after vestibular rehabilitation.

(Tr. at 29-30, internal record citations omitted.) While plaintiff may have wanted the ALJ to include more significant restrictions to account for these symptoms, a reviewing court will not substitute its judgment for that of the ALJ. <u>E.g.</u>, <u>Rabdeau v. Bisignano</u>, 155 F.4th 908, 912 (7th Cir. 2025).

Plaintiff contends that the ALJ simply did not understand what to look for in cases involving POTS and vertigo symptoms, that Dr. Siddiqui's impression was based on her objectively established impairments, and that it is unclear why the ALJ believed his opinions were based on her symptom report. (Pl.'s Br. at 15.) Nothing in the ALJ's decision suggests a fundamental misunderstanding of the impairments at issue. <u>Cf.</u> <u>Sarchet v. Chater</u>, 78 F.3d 305, 307 (7th Cir. 1996) (finding the ALJ displayed "a pervasive misunderstanding" of fibromyalgia

17

when he faulted the claimant for seeing a rheumatologist rather than an orthopedist, and depreciated the gravity of her condition because she did not display swelling of the joints, which is not a symptom of fibromyalgia). Further, it was reasonable for the ALJ to surmise that some of Dr. Siddiqui's suggested limitations were based on plaintiff's subjective reports. As summarized above, the first page of Dr. Siddiqui's 10/8/24 note consists primarily of plaintiff's reports regarding her symptoms. (Tr. at 2455, "she reports that she feels extremely terrified, needs to lie down and needs cool rags on her face to keep from passing out.") In setting forth his opinions later in this note, Dr. Siddiqui closely tracked plaintiff's reports. (Tr. at 2457, "Additionally, the patient would need to be able to lie down at a very short notice if she has exasperation of her symptoms. This would then require appropriate hydration, lifting up her lower extremities as well as cool rags to help her for preventing to pass out.")[1]

Plaintiff argues that Dr. Siddiqui's suggestion that she needed a walker was reinforced by his June 2024 recommendation that she use a walker when ambulating longer distances. (Pl.'s Br. at 13-14.) As indicated, the ALJ specifically discussed this treatment note earlier in

---

[1]In reply, plaintiff notes that doctors will take their patients' subjective reports into account. (Pl.'s Rep. Br. at 2, citing Thompson v. Berryhill, 722 Fed. Appx. 573, 581 (7th Cir. 2018).) However, the Seventh Circuit has consistently held that an opinion based primarily on subjective reports may be discounted. Plaintiff faults the Commissioner for citing an older case, Bates v. Colvin, 736 F.3d 1093, 1100 (7th Cir. 2013). (Def.'s Br. at 10; Pl.'s Rep. Br. at 3.) But the unpublished decision in Thompson did not overrule Bates or alter the Seventh Circuit's longstanding rule that ALJs have the discretion to discount opinions based on the claimant's subjective complaints. E.g., Cain v. Bisignano, 148 F.4th 490, 497 (7th Cir. 2025). As indicated in the text, in the present case, it was reasonable for the ALJ to surmise that Dr. Siddiqui drew some of his proposed limitations directly from plaintiff's reports. Plaintiff also claims in reply that it is now outside the purview of an ALJ to make a credibility evaluation. (Pl.'s Rep. Br. at 3-4.) Plaintiff overstates the change brought about by SSR 16-3p. "The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain assertions by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." Cole v. Colvin, 831 F.3d 411, 412 (7th Cir. 2016).

18

the decision. See Curvin v. Colvin, 778 F.3d 645, 650 (7th Cir. 2015) ("We do not discount [this discussion] simply because it appears elsewhere in the decision."). In finding that plaintiff had not demonstrated a documented medical need for an assistive device, the ALJ noted that Dr. Siddiqui did not observe any deficits during this appointment, and the record did not show that plaintiff received an assistive device or that she used one at subsequent appointments. In contrast, she was generally noted to have a normal gait. (Tr. at 21.) Plaintiff does not meaningfully challenge this evidence.

Plaintiff next argues that Dr. Siddiqui's suggestion that she needed to be able to lie down on short notice finds support in the recommendation of Dr. Jodi Zilinski that plaintiff heed warning symptoms and immediately lie down and elevate her legs if symptoms were to come on. (Pl.'s Br. at 14, citing Tr. at 442, 1655, 1840.) Again, plaintiff overlooks the ALJ's discussion of her January 2024 visit with Dr. Zilinski, at which she:

> reported she was feeling "fine." She had occasional chest pain for a few seconds. Her palpitations had improved with Propranolol. She denied any episodes of lightheadedness, dizziness, chest pain, shortness of breath, or syncope. However, she had increased light sensitivity. Her physical examination signs were unremarkable. The claimant was continued on her current regimen and asked to follow up in one year. She was advised to exercise as tolerated, with a warm up and cool down each time.

(Tr. at 28, citing Tr. at 1839-40.) Nothing in Dr. Zilinski's notes compelled the ALJ to include additional limitations in the RFC. See Delong v. Saul, 844 Fed. Appx. 894, 900 (7th Cir. 2021) ("[E]ven if the record could support such limitations, there is nothing that compels them."); see also Gedatus v. Saul, 994 F.3d 893, 900 (7th Cir. 2021) ("We will reverse only if the record compels a contrary result.") (internal quote marks omitted).

Plaintiff contends that the ALJ "played doctor" in calling into question whether common symptoms of these impairments would be present in this case. (Pl.'s Br. at 15.) As indicated

19

above, the ALJ accepted that plaintiff experienced symptoms, just not of the severity she alleged. Plaintiff cites Moreno v. Berryhill for the proposition "that ALJs are not qualified to evaluate medical records themselves, but must rely on expert opinions." 882 F.3d 722, 729 (7th Cir. 2018) (citing Meuser v. Colvin, 838 F.3d 905, 911 (7th Cir. 2016) (remanding because the ALJ improperly "played doctor"); Goins v. Colvin, 764 F.3d 677, 680 (7th Cir. 2014) (prohibiting ALJs from "playing doctor" by summarizing the results of a medical exam without input from an expert)). (Pl.'s Br. at 15.) Plaintiff fails to acknowledge that the Seventh Circuit modified its opinion in Moreno, granting the Commissioner's petition for panel rehearing, deleting the sentence quoted above, and replacing it with more tailored language: "That assessment was not justified under the circumstances of this case." Moreno v. Berryhill, No. 17-1954, 2018 U.S. App. LEXIS 9296, at *1-2 (7th Cir. Apr. 13, 2018).

Of course, ALJs must evaluate the medical evidence in deciding a disability claim, and the regulations specifically require them to consider the consistency of the medical opinions with the other evidence of record. An ALJ does not "play doctor" by weighing the evidence. Thorps v. Astrue, 873 F. Supp. 2d 995, 1006 (N.D. Ill. 2012); see also Seamon v. Astrue, 364 Fed. Appx. 243, 247 (7th Cir. 2010) ("An ALJ may not 'play doctor' by substituting his opinion for that of a physician. The ALJ, however, is not only allowed to, but indeed must, weigh the evidence and make appropriate inferences from the record.") (internal citation omitted); Patricia B. v. Berryhill, No. 17 CV 50201, 2019 U.S. Dist. LEXIS 13790, at *5 (N.D. Ill. Jan. 29, 2019) ("An ALJ plays doctor by ignoring relevant medical evidence and using his judgment to make his own medical findings; in contrast, he does not play doctor when he discusses and weighs the medical evidence and makes appropriate inferences from that evidence.").

Plaintiff contends that the ALJ ignored support for Dr. Siddiqui's opinions and

20

mischaracterized the record. (Pl.'s Br. at 15.) However, the ALJ thoroughly reviewed the medical evidence over 6-½ single spaced pages, and plaintiff identifies no important evidence she overlooked. See Deborah M. v. Saul, 994 F.3d 785, 788 (7th Cir. 2021) ("[A]n ALJ need not discuss every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability.") (cleaned up).

Plaintiff faults the ALJ for relying on a cardiac evaluation, which she contends is irrelevant to her POTS, as her POTS management was left to her electrophysiologist and primary care physician. (Pl.'s Br. at 16.) But the "cardiac follow up" the ALJ cited in discussing Dr. Siddiqui's opinions was with the electrophysiologist, Dr. Zilinski. (Tr. at 30, citing Tr. at 1840.)

Plaintiff concludes that by rejecting the bulk of Dr. Siddiqui's opinions and declining to fully adopt the agency medical consultants' opinions, the ALJ created an "evidentiary gap." (Pl.'s Br. at 16.) District courts in this circuit have recognized that an ALJ's decision to discount all medical opinion evidence in the record can create an "evidentiary gap" that renders the ALJ's RFC unsupported by substantial evidence. Timothy L. v. Dudek, No. 22 CV 6799, 2025 U.S. Dist. LEXIS 89740, at *5 (N.D. Ill. May 12, 2025). However, reversible error will occur only when the ALJ, after rejecting the opinion evidence, crafts an RFC determination that is untethered to any record evidence. Id.

This follows from the fact that determination of a claimant's RFC is a matter for the ALJ alone—not any doctor—to decide. Thomas v. Colvin, 745 F.3d 802, 808 (7th Cir. 2014); see also Diaz v. Chater, 55 F.3d 300, 306 n.2 (7th Cir. 1995) (rejecting the notion that RFC is a "medical judgment" and must be based solely on the opinions of physicians). In determining RFC, the ALJ considers the entire record; she is not required to rely entirely on a particular

21

physician's opinion or choose between the opinions any of the claimant's physicians. <u>Pufahl v. Bisignano</u>, 142 F.4th 446, 458 n.18 (7th Cir. 2025) (citing <u>Schmidt v. Astrue</u>, 496 F.3d 833, 845 (7th Cir. 2007)).

Here, the ALJ thoroughly reviewed the treatment records, evaluated the persuasiveness of the various medical opinions based on the regulatory factors, and then adopted an RFC based on the entire record, finding plaintiff somewhat more limited than did the agency medical consultants based in part on plaintiff's subjective statements and the medical evidence produced at the hearing level.[2] <u>See</u> <u>Vang v. Berryhill</u>, No. 18-C-277, 2019 U.S. Dist. LEXIS 240254, at *33-34 (E.D. Wis. Mar. 5, 2019) (rejecting "evidentiary deficit" argument where the ALJ discounted a treating source opinion and partially credited the opinions of the agency consultants, finding the claimant somewhat more limited than the consultants based on the claimant's subjective complaints), <u>aff'd</u>, 805 Fed. Appx. 398 (7th Cir. 2020). "Plaintiff does not explain how the ALJ erred by adopting a more restrictive RFC than either agency medical consultant assessed." <u>Deheck v. Kijakazi</u>, No. 21-C-1191, 2022 U.S. Dist. LEXIS 163492, at *25 (E.D. Wis. July 20, 2022) (citing <u>Brandt v. Saul</u>, No. 20-C-1471, 2022 U.S. Dist. LEXIS 3320, at *44 (E.D. Wis. Jan. 7, 2022)); <u>see also</u> <u>Ware v. Colvin</u>, No. 14 CV 4458, 2016 U.S. Dist. LEXIS 64271, at *19 (N.D. Ill. May 16, 2016) (rejecting as "misguided" the claimant's argument that the ALJ erred by finding her more limited than did the agency consultant).[3]

---

[2]The agency medical consultants, Drs. Khorshidi and Chan, considered all of plaintiff's impairments, including POTS, finding her capable of light work with environmental limitations. The ALJ limited plaintiff to sedentary work, with additional non-exertional limitations. In so doing, the ALJ partially credited Dr. Siddiqui's opinion regarding plaintiff's lifting and climbing abilities. (Tr. at 30.)

[3]Plaintiff cites cases where the ALJ interpreted new and potentially decisive medical evidence without medical expert review. (Pl.'s Br. at 17, collecting cases). However, she fails

22

In reply, plaintiff contends that the ALJ should have sought a new medical expert's review (Pl.'s Rep. Br. at 2), but she provides no authority for the proposition that such additional review is required simply because the ALJ declined to rely entirely on any particular opinion. Nor does she develop an argument that new evidence required re-submission to a medical expert. See Durham v. Kijakazi, 53 F.4th 1089, 1095 (7th Cir. 2022) (noting that an ALJ may not interpret new and potentially decisive medical evidence without medical scrutiny). Plaintiff also insists that the ALJ was unqualified to independently interpret the record and assess different limitations than any doctor assessed. (Pl.'s Rep. Br. at 3.) This again reflects a misunderstanding of how RFC is determined:

> As the Seventh Circuit instructed in Vang v. Saul, 805 F. App'x. 398, 401-02 (7th Cir. 2020), the ALJ must "consider all limitations supported by [the] record evidence" and "tie the record evidence to the limitations included in the RFC finding," but he need not match RFC conclusions item-by-item with medical opinions. The ALJ did what the regulations require, and he did not play doctor; he substantially evaluated the opinions as to supportability and consistency and determined that the medical opinions were unpersuasive while relying upon the objective medical records to craft the RFC.

Gina V. v. Kijakazi, No. 20 C 4009, 2022 U.S. Dist. LEXIS 83302, at *18 (N.D. Ill. May 9, 2022); see also Barker v. Saul, No. 20-CV-38, 2021 U.S. Dist. LEXIS 42574, at *7-8 (E.D. Wis. Mar. 8, 2021):

> [Plaintiff's] argument that the ALJ impermissibly played doctor rests on an overly expansive understanding of this commonly alleged error. See Arrowood v. Saul, No. 19-CV-1835, 2021 U.S. Dist. LEXIS 35227, at *5-7 (E.D. Wis. Feb. 25, 2021). "While an ALJ may not substitute her own judgment for a physician's without relying on other medical evidence of record, [she] is not only allowed to, but must, weigh the evidence, draw appropriate inferences from the evidence, and, where necessary, resolve conflicts in the evidence." Sauer v. Saul, No. 19-C-927, 2020 U.S. Dist. LEXIS 108750, at *36 (E.D. Wis. June 19, 2020). An ALJ does not impermissibly play doctor simply because [she] discounts the

to identify the "raw medical evidence" the ALJ interpreted in lay fashion in this case.

23

formal medical opinions in the record. <u>Arrowood</u>, 2021 U.S. Dist. LEXIS 35227, at *5-7. An ALJ's conclusions need not match any physician's opinion. <u>Whitehead v. Saul</u>, No. 20-1528, 841 Fed. Appx. 976, 2020 U.S. App. LEXIS 40760, at *18 (7th Cir. Dec. 30, 2020).

In sum, the ALJ reasonably discounted Dr. Siddiqui's opinions after considering the regulatory factors. She then crafted an RFC based on the entire record, including the objective medical evidence, the medical opinions, and plaintiff's statements. No more was required.

### 2. Subjective Symptom Reports

Plaintiff next argues that the ALJ inadequately considered her subjective symptom reports. (Pl.'s Br. at 18.) In determining whether a claimant is disabled, the ALJ must consider all symptoms, including pain, and the extent to which those "symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). SSR 16-3p sets forth a two-step process for symptom evaluation. First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2016 SSR LEXIS 4, at *5. Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to function. <u>Id.</u> at *9.

At the second step, the ALJ may not discount a claimant's subjective complaints simply because her statements are not supported by objective medical evidence. <u>See</u> <u>id.</u> at *9-10; <u>Cain</u>, 148 F.4th at 497. Rather, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record considering, in addition to the objective medical evidence, 2016 SSR LEXIS 4, at *11, the claimant's daily activities; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects

24

of any medication the claimant takes or has taken to alleviate the symptoms; treatment, other than medication, the claimant receives or has received for relief of the symptoms; and any measures other than treatment the claimant uses or has used to relieve the symptoms, id. at *18-19.

"The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Id. at *26. So long as the ALJ gives specific reasons supported by the record, the court will overturn her credibility determination only if it is "patently wrong." Pufahl, 142 F.4th at 458.

The ALJ followed the two-step process in this case (Tr. at 21-22), concluding that while plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. at 21-22.) In support of this finding, the ALJ considered the objective medical evidence, including the imaging studies showing only mild degenerative changes; the benefit plaintiff received from Chiari decompression surgery; her intermittent complaints of urinary frequency and delay in scheduling a release procedure for tethered cord, suggesting that her symptoms were tolerable; the effectiveness of medication in managing her back pain; the exam findings of normal or non-antalgic gait; the absence of evidence documenting ongoing issues with syncope, such as medical treatment for injuries after fainting, and evidence that her symptoms often resolved within less than a minute; her reports of good management of symptoms with medication and vestibular rehabilitation; and her daily activities,

25

including preparing meals, helping care for her children, driving a car, shopping in stores, watching TV, and managing funds. (Tr. at 29-30.)

Again focusing on the symptoms attributable to POTS and vertigo,[4] plaintiff complains that the ALJ relied on the lack of treatment for falls and two instances where she indicated her symptoms rapidly resolved, arguing it is not apparent why such narrow examples discredit the bulk of her testimony. She attributes the absence of evidence of falls to her compliance with recommendations to lie down when she felt symptoms coming on. Plaintiff also faults the ALJ for relying on reports of "good management" of symptoms with medication and physical therapy. (Pl.'s Br. at 19.) She concedes that the record contains reports of improvement but indicates that her symptoms tended to fluctuate in intensity and frequency, thus providing no basis for rejecting her symptom report outright. (Pl.'s Br. at 19-20.)

As indicated above, the ALJ did not rejected plaintiff's "symptom report outright." The ALJ acknowledged plaintiff's reports of dizziness and lightheadedness, with unpredictable triggers, including climbing and environmental limitations. (Tr. at 29.) However, the ALJ declined to find these symptoms totally disabling, based on the absence of evidence of more severe episodes, the effectiveness of treatment, and plaintiff's daily activities. (Tr. at 29-30.) Plaintiff develops no argument that the evidence the ALJ cited failed to support her conclusion, nor does plaintiff cite any record evidence compelling a different conclusion.

Plaintiff also complains that the ALJ failed to explain how her daily activities showed she could handle a full-time job. (Pl.'s Br. at 20, citing Moore v. Colvin, 743 F.3d 1118, 1127 (7th

---

[4]Because plaintiff does not challenge the ALJ's consideration of her other impairments/symptoms, any such arguments are waived. See Milhem v. Kijakazi, 52 F.4th 688, 693 (7th Cir. 2022) ("Arguments not raised in the district court are waived.") (internal quote marks omitted).

26

Cir. 2014).) The ALJ did not in this case make the common mistake of equating daily tasks with full-time work. See Deheck v. Kijakazi, No. 21-C-1191, 2022 U.S. Dist. LEXIS 163492, at *31 (E.D. Wis. July 20, 2022) (noting the critical difference between an ALJ improperly saying, "the claimant can perform this range of activities, therefore he can work," and an ALJ reasonably saying, "the claimant can perform this range of activities, therefore he can do more than he claims"). Instead, the ALJ cited these activities as evidence that plaintiff's statements regarding the frequency and intensity of her symptoms were exaggerated. See Alvarado v. Colvin, 836 F.3d 744, 750 (7th Cir. 2016) ("[W]e have cautioned ALJs not to equate such activities with the rigorous demands of the workplace. But it is entirely permissible to examine all of the evidence, including a claimant's daily activities, to assess whether testimony about the effects of his impairments was credible or exaggerated.") (internal citations and quote marks omitted).

In reply, plaintiff suggests that, once the ALJ finds the existence of a medically determinable impairment that could reasonably be expected to produce the alleged symptoms, the objective medical evidence largely drops out of the picture. (Pl.'s Rep. Br. at 4-5.) At that point, she contends, the ALJ is required to credit a claimant's symptom report unless the ALJ can demonstrate inconsistency with the rest of the record. (Pl.'s Rep. Br. at 5.) She goes on to say the alleged nature and severity of the symptoms should be adopted unless there is inconsistent evidence, and an ALJ should accept the claimant's report unless it would be unreasonable to do so. (Pl.'s Rep. Br. at 6.) Plaintiff argues that the ALJ did not point to such inconsistencies here. (Pl. Rep. Br. at 5.)

It is the claimant's "burden, not the ALJ's, to prove that she [is] disabled." Summers v. Berryhill, 864 F.3d 523, 527 (7th Cir. 2017); see also Cynthia R. v. Bisignano, No. 1:25-cv-00445, 2026 U.S. Dist. LEXIS 19689, at *11 (S.D. Ind. Jan. 30, 2026) ("It is Plaintiff—not

27

the ALJ—who has the burden of proving a disabling degree of symptoms.") (citing <u>Karr</u>, 989 F.3d at 513). Nothing in the regulations supports the burden-shifting plaintiff proposes at the second step of symptom evaluation:

> In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all of your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work. However, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled. In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you. We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a).

While an ALJ may not, at the second step, discount a claimant's symptoms based <u>solely</u> on a lack of objective medical support, the ALJ will consider the objective medical evidence as part of the analysis. <u>Id.</u> § 404.1529(c)(2). As SSR 16-3p explains, "Symptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques. However, objective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities[.]" 2016 SSR LEXIS 4, at *10-11. The ALJ will base her step-two determination on the entire record, including the objective medical evidence,

considering the regulatory factors set forth above. Ultimately, a claimant's "symptoms, including pain, will be determined to diminish [her] capacity for basic work activities to the extent that [her] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4).

Courts have rejected the notion that an ALJ is required to award benefits whenever she is unable to conclusively refute each subjective complaint a claimant makes. Boeck v. Berryhill, No. 16-C-1003, 2017 U.S. Dist. LEXIS 161683, at *52 (E.D. Wis. Sept. 30, 2017); see also Sharyl M. v. Kijakazi, No. 20-cv-0427, 2022 U.S. Dist. LEXIS 165433, at *13 (N.D. Ill. Sept. 14, 2022) (noting that it is the claimant's burden to prove disabling symptoms, not the ALJ's burden to disprove them); Richard S. v. Comm'r of Soc. Sec.,  No. 19-cv-1088, 2021 U.S. Dist. LEXIS 9531, at *16 (C.D. Ill. Jan. 19, 2021) (noting that there is no presumption that the statements of claimants seeking disability benefits are true absent conclusive evidence that they are exaggerating their symptoms); Joyce W. v. Berryhill, No. 2:18-cv-104, 2019 U.S. Dist. LEXIS 93099, at *8 (N.D. Ind. June 3, 2019) ("Plaintiff's logic implies that upon an assertion of functional limitations, the burden shifts to the ALJ to disprove the claimant. This is not the case."). As Judge Griesbach has explained:

> Thus, instead of requiring conclusive evidence that a claimant is not telling the truth, the ALJ need only provide reasons based on the record as a whole why the claimant's testimony was not fully credited. The reasons provided by the ALJ must of course be logical, but they need not rule out any possibility that the claimant is truthful. Even in criminal cases where the burden of proof is beyond a reasonable doubt, conclusive evidence is not required to sustain the verdict.

Roovers v. Colvin, No. 14-C-270, 2015 U.S. Dist. LEXIS 8538, at *16-17 (E.D. Wis. Jan. 26, 2015).

29

In the present case, the ALJ considered the regulatory factors, then provided specific reasons supported by evidence from the record for not fully accepting plaintiff's statements. Again, no more was required. While plaintiff disagrees with the reasons the ALJ provided (see Pl.'s Rep. Br. at 7), she fails to demonstrate that the decision lacks any explanation or support. See Hess v. O'Malley, 92 F.4th 671, 679 (7th Cir. 2024) ("We will overturn the ALJ's evaluation of a claimant's subjective symptoms only if it is patently wrong, which means that the decision lacks any explanation or support.") (internal quote marks omitted); see also Kinnari v. Saul, No. 19 C 760, 2020 U.S. Dist. LEXIS 65005, at *7 (N.D. Ill. Apr. 14, 2020) ("[A] mere disagreement with the ALJ does not warrant remand.").

## III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is affirmed, and this case is dismissed. The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 5th day of May, 2026.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge

30